UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| JESSICA SERVAIS,<br><br>    Plaintiff,<br><br>    v.<br><br>JOHN CACCIA, et al.,<br><br>    Defendants. | Civil Action<br><br>No. 1:20-CV-14601-KMW-EAP<br><br>**OPINION** |

**David R. Castellani, Esq.**
Castellani Law Firm, LLC
450 Tilton Road, Suite 245
Northfield, NJ 08225

*Counsel for Plaintiff Jessica Servais,
Administrator Ad Prosequendum and
Administrator of the Estate of Jacob Servais*

**Thai Nguyen, Esq.**
New Jersey Office of the Attorney General
25 Market Street
Trenton, NJ 21144

*Counsel for Defendants John Caccia, Paul
Skill, Cape May County Prosecutors Office,
and the State of New Jersey*

**WILLIAMS, District Judge:**

## I. INTRODUCTION

  This case arises out of the shooting death of Plaintiff's son, Jacob Servais ("Servais"). On October 18, 2018, Defendant John Caccia, a detective from the Cape May County Prosecutor's Office ("Caccia"), fatally shot Servais during an operation in which he and other officers attempted to apprehend Servais and his girlfriend, Deshyamma Dalton ("Dalton"). This operation occurred in the context of a broader criminal investigation that largely targeted Dalton, who was identified as a primary suspect in two separate armed robberies. Though, during the course of that investigation, Servais also came to be identified by law enforcement as a suspected accomplice. When officers attempted to arrest Servais and Dalton, Servais was non-compliant.

From behind the wheel of his vehicle, Servais ignored the officers' commands, refused to surrender, and actively attempted to flee the scene. Eventually, Servais began threatening the officers by driving his vehicle directly at them, which ultimately led Caccia to shoot Servais through his front windshield three times. Servais later succumbed to his injuries.

Plaintiff brings this action in her individual capacity and as the administrator of Servais's estate, alleging various civil rights claims against Caccia, Chief Paul Skill, the Cape May County Prosecutors Office, and the State of New Jersey (together, "Defendants"). Presently before the Court is Defendants' Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56, which Plaintiff has opposed. For the reasons that follow, Defendants' Motion is granted.

## II.    FACTUAL BACKGROUND[1]

### A.   <u>First Armed Robbery</u>

On October 14, 2018, Dalton—along with two, unidentified men—robbed a female victim at gunpoint. *See* Defs.' Statement of Material Facts ("Defs.' SMF") ¶ 1. According to a criminal incident report from the Franklin Township Police Department (the "FTPD"), the victim reported that she believed she was being followed by another vehicle after she left work at approximately 2:30 a.m. *See* Def.'s Ex. A at 1–2. Upon arriving to a friend's home, the victim sat in her car for a few minutes, when an SUV suddenly pulled in front of her. *See id.* at 2. Dalton was driving the SUV and was accompanied by two men who had their faces covered. *See id.* When the men exited the SUV, the victim reported that one of them was carrying some sort of rifle. *See id.* The men then took various items from the victim's car and proceeded to throw her

---

[1] Unless otherwise noted, the following facts are deemed undisputed for purposes of this Opinion.

phone in the grass. *See id.* Dalton and the two men subsequently left with the victim's belongings. *See id.*

### B. Second Armed Robbery

Three days later, on October 17, 2018, Dalton orchestrated a second armed robbery of a male victim at his home in Cumberland County, New Jersey. *See* Defs.' SMF ¶ 8. The victim reported that he had invited Dalton to his home through Facebook Messenger and that, after she arrived, she unlocked the door and let in three unidentified men; again, all of the men had their faces covered, and one of the assailants was carrying a rifle. *See id.* ¶¶ 9–10. At some point, the three men began beating the victim, using the rifle as a club, and leaving him with several cranial fractures, including a two-millimeter hole in his skull. *See id.* ¶ 11. After restraining the victim, Dalton and the men began searching his home and eventually found the victim's wallet and debit card. *See id.* ¶ 12. The suspects then forced the victim tell them the PIN number to his debit card, after which he managed to escape from his restraints and ran out of his home for help. *See id.*; *see also* Defs.' Ex. C at 3–4.

Shortly after the victim was robbed, the Cape May County Prosecutor's Office (the "CMCPO") opened an investigation. *See* Defs.' SMF ¶ 13. Meanwhile, Dalton and her accomplices drove to a gas station where they used the victim's debit card to withdraw money. *See id.* ¶ 14. Upon being notified of this transaction, CMCPO detectives traveled to the gas station, reviewed its surveillance footage, and subsequently learned that the vehicle was in fact owned by Just Four Wheels—a rental car company in Vineland, New Jersey. *See id.* ¶ 15. It was at this point that CMCPO detectives identified Dalton as the person behind the second robbery, as she had rented the car in her name just six days earlier. *See id.* This same day, a warrant was

issued for Dalton's arrest in connection with the second robbery, charging her with attempted murder, aggravated assault, criminal restraint, theft, robbery, and conspiracy. *See* Defs.' Ex. D.

### C. CMCPO-FTPD Joint Operation

At some point, the CMCPO and FTPD began cooperating to apprehend Dalton after concluding that she was behind both armed robberies in their respective jurisdictions. During the course of this joint investigation, Caccia and FTPD detective Dallas Bohn ("Bohn") were able to identify several potential accomplices who may have participated in the armed robberies with Dalton, among whom was her boyfriend, Servais. The officers subsequently learned that Servais had a criminal history that included aggravated assault, aggravated assault on police, robbery, theft, and resisting arrest. *See* Defs.' SMF ¶¶ 20–21; *see also* Defs.' Exs. F at 6, H at 5. They also discovered that Servais was in fact wanted for failing to appear for a related vehicular homicide charge, and that he had allegedly killed someone while fleeing from the police. *See* Defs.' SMF ¶ 17; *see also* Defs.' Exs. F at 6, H at 5, 16; Caccia Dep. Tr. at 105:18–22; Bohn Dep. Tr. at 75:19–24.

On October 18, 2018, the day after the second robbery, the CMCPO and the FTPD became aware that Dalton was going to be returning the vehicle to Just Four Wheels later in the day. *See* Defs.' SMF ¶ 23. With this information, the CMCPO and the FTPD planned a joint, covert operation whereby their agents, including Caccia and Bohn, would intercept Dalton as she was returning the vehicle and arrest her, along with any person accompanying her suspected of participating in the robberies. *See id.* However, after arriving to Just Four Wheels, Caccia and Bohn decided that they would need backup in the event Dalton arrived with any suspected accomplices, which led CMCPO and FTPD to send three additional detectives—FTPD detective Michael Iames ("Iames"), and CMCPO detectives Michael Jefferson ("Jefferson") and Sarah

Best ("Best"). Defs.' SMF ¶¶ 25–27. All of these detectives arrived at the scene shortly after they were called. *See id.*

As the detectives waited for Dalton to arrive, a Just Four Wheels employee notified Caccia that Dalton had called to inform that she was running late due to a flat tire. *See* Defs.' SMF ¶ 28. Now anticipating the possibility that there could be a second car following Dalton to return the vehicle, the detectives made a plan—should a "trail car" arrive with Dalton, Jefferson and Iames would effectuate Dalton's arrest, while Caccia, Bohn, and Best remain outside for the trail car. *See id.* ¶ 29. None of the detectives knew in advance who, if anyone, would accompany Dalton. *See id.* ¶ 30. While making this plan, the detectives also agreed that, to the extent a trail car did arrive, they would confront the vehicle in the parking lot and arrest any suspects in it. *See id.* ¶ 31. However, in the event one or more suspects in the trail car escaped the parking lot either in the vehicle or on foot, the detectives did not plan to pursue him or her because they were unfamiliar with the area. *See* Defs.' SMF ¶ 32; *see also* Bohn Dep. Tr. at 37:11–21.

Shortly after 3:30 p.m., Caccia and Bohn identified Dalton in the rental car as she pulled into the Just Four Wheels parking lot. *See* Defs.' SMF ¶ 33. Seconds later, a trail car did indeed pulled in behind her and backed into one of the parking spaces in the lot. *See id.* ¶ 33. Caccia and Bohn identified Servais as the driver of the trail car. *See id.* ¶ 34. With both vehicles now in the parking lot, Caccia and Bohn turned into the lot, activated their emergency lights, and pulled in front of Servais's vehicle, leaving between two and three feet of space between their front bumpers. *See id.* ¶¶ 35–36. The detectives then confronted Servais, drew their weapons, and ordered him out of the vehicle. *See id.* ¶ 38. Servais did not comply with the detectives' commands, and instead looked at them and shook his head "no." *See id.* ¶ 40. At this time,

Servais had his left hand on the steering wheel and his right hand below the dashboard outside of the detectives' view. *See id.* ¶ 41.

Still ignoring the detectives' commands, Servais then attempted to escape and proceeded to drive his car forward at Bohn. *See id.* ¶ 43. Bohn then "moved to [his] right to get out of the way." Bohn Dep. Tr. at 51:14–15; *see also* Defs.' SMF ¶ 44. Servais then reversed his vehicle back into the parking spot, hitting the short, concrete parking blocks behind him. *See* Defs.' SMF ¶ 45–46. Despite continued warnings and commands to stop, Servais again placed his vehicle in drive and drove directly at Caccia. *See id.* ¶ 47. Fearing that Servais was going to hit and kill him, Caccia shot through Servais's windshield three times, but stopped once Servais ceased moving forward. *See id.* ¶ 50.

Although Servais was no longer driving toward Caccia, he still did not surrender and continued to ignore the detectives' commands. Servais reversed his vehicle again, this time running over the concrete parking blocks behind him, and drifted backwards into a separate parking lot adjacent to Just Four Wheels. *See id.* ¶ 57. The detectives proceeded to the other parking lot on foot and continued to scream at Servais to put his hands up and to get out of the car. *See id.* ¶ 60. At this point, Bohn saw Servais put one hand up, but he could not see Servais's other hand, leading Bohn to believe that Servais was reaching for a weapon. *See id.* However, the detectives then saw Servais's face and body go limp. *See id.* ¶ 61. Caccia, Bohn, and Iames each performed CPR until paramedics arrived. *See id.* ¶¶ 62–63. Servais was ultimately pronounced dead at 4:27 p.m. *See id.* ¶ 64.

## III.    STANDARD OF REVIEW

A court may grant summary judgment when the materials of record "show[ ] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *See Anderson*, 477 U.S. at 256–57. "A non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.    DISCUSSION

Defendants have moved for summary judgment with respect to all of Plaintiffs' claims against them, which include her claims (1) against Caccia for excessive force and civil conspiracy under 42 U.S.C. § 1983; and (2) against all Defendants for various state law claims.[2] The Court addresses each in turn.

### A.  Plaintiff's Excessive Force Claim

Claims for excessive force under the Fourth Amendment are predicated on 42 U.S.C. § 1983, which "provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation marks omitted). "Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Santini*, 795 F.3d at 417 (internal quotations marks omitted).

"Qualified immunity shields government actors from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zaloga v. Borough of Moosic*, 841 F.3d 170, 174 (3d Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). At its core, qualified immunity "is not a mere

---

[2] Plaintiff also brings claims against Defendant Skill in his individual capacity under both state and federal law, in which she seeks to hold him liable for Caccia's use of force. Defendants have moved for summary judgment on these claims, arguing that there is no record evidence suggesting that Skill participated in the shooting, had actual knowledge of the shooting, or otherwise acquiesced in it. However, because Plaintiff's Opposition does not address, acknowledge, or rebut Defendants' substantive arguments with respect to Skill, the Court finds that Plaintiff has abandoned those claims and accordingly grants Defendants' Motion for Summary Judgment. *See Samoles v. Lacey Twp.*, No. 12-3066, 2014 WL 2602251, at *4 n.8 (D.N.J. June 11, 2014) ("District courts in and out of this Circuit routinely deem abandoned a party's claim when that party fails to present any opposition to a motion for summary judgment.").

defense from liability," but is rather "an entitlement not to stand trial or face the other burdens of litigation." *Curley*, 298 F.3d at 277 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (internal quotation marks omitted). "The recognition of a qualified immunity defense . . . reflects an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also the need to protect officials who are required to exercise discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow*, 457 U.S. at 807. Officers bear the burden of establishing their entitlement to qualified immunity at the summary judgment stage. *See Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021).

To determine whether Caccia is entitled to qualified immunity, the Court must undertake a two-prong inquiry. First, the Court must engage in a constitutional analysis and decide "whether the facts—taken in the light most favorable to the nonmoving party—show that a government official violated a constitutional right." *Santini*, 795 F.3d at 417 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, the Court considers "whether that right was clearly established at the time of the official's actions." *Id.* "An answer in the negative to either prong entitles an officer to qualified immunity." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).[3]

### 1) *Constitutional Inquiry*

In excessive force cases, federal courts determine whether a constitutional violation has occurred using the Fourth Amendment's "objective reasonableness test." *Santini*, 795 F.3d at

---

[3] Though courts are not constrained to approach a qualified immunity analysis in any particular order, this Court exercises its discretion to first address whether Caccia's actions violated a constitutional right. *See Pearson,* 555 U.S. at 236 (observing that district courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

417.[4] To this end, the Court must assess "the reasonableness of the officer's belief as to the appropriate level of force[,]" which "should be judged from [the officer's] on-scene perspective," and not in the "20/20 vision of hindsight." *Saucier*, 533 U.S. at 205 (internal citations and quotation marks omitted). "While this inquiry is highly individualized and fact specific," *Santini*, 795 F.3d at 417, the Supreme Court in *Graham v. Connor* prescribed three relevant factors to consider: (1) "the severity of the crime at issue," (2) "whether the suspect poses an imminent threat to the safety of the police or others in the vicinity," and (3) "whether the suspect attempts to resist arrest or flee the scene," 490 U.S. at 396.

Before proceeding any further, the Court finds it necessary to first set the record straight. In her Opposition to Defendants' Motion for Summary Judgment, Plaintiff primarily argues that the evidentiary record is so "highly disputed" that the Court cannot determine, as a matter of law, that Caccia's use of force was reasonable under the circumstances. *See, e.g.*, Pl.'s Br. at 5. However, having undertaken an extensive review of the evidentiary record, the Court concludes that the factual disputes Plaintiff describes are simply non-existent. Indeed, what the Court finds in Plaintiff's arguments is an unmistakable pattern of disingenuous quibbling that is clearly designed to manufacture ambiguity and doubt.[5] What is more, Plaintiff often argues that a fact is

---

[4] The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." Thus, "[t]o prevail on a Fourth Amendment excessive-force claim, a plaintiff must show [1] that a seizure occurred and [2] that it was unreasonable under the circumstances." *Lamont v. New Jersey*, 637 F.3d 177, 182–83 (3d Cir. 2011). Here, there is no dispute that Plaintiff was "seized" given that he was shot and killed. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). Thus, the only relevant consideration under a Fourth Amendment analysis is whether Caccia's exercise of deadly force was objectively reasonable under the circumstances.

[5] For example, Plaintiff's Exhibit V is a forensics recreation of the trajectory angle of the bullets fired by Caccia through Servais's front windshield. Though Plaintiff does not argue as much in her brief, she submits in her Supplemental Statement of Material Facts ("Pl.'s SSMF") that a "reasonable jury could infer" from this photo that Caccia "was not in the path of the vehicle when he shot [Servais]." Pl.'s SSMF ¶ 43. But how can that be when (1) the photo clearly depicts a straight trajectory from the front of the vehicle, and (2) Plaintiff has otherwise acknowledged and conceded Caccia's head-on position with respect to the vehicle? As far as the Court can tell,

vague or inconsistent where no such vagueness exists in the record and where such inconsistencies were often contradicted by her own arguments.

Perhaps most troubling is the number of instances in which Plaintiff outright misrepresents material facts that are indispensable to this Court's inquiry. For example, Plaintiff's brief repeatedly submits that Caccia's use of lethal force was not objectively reasonable because Servais was, in fact, trying to surrender in the moments before he was shot. In no less than six instances, Plaintiff states that Servais had his "hands up or in the air as instructed" in a "surrendering position," and that he was "submitting" to the officers' commands before Caccia discharged his weapon. *See, e.g.*, Pl.'s Br. at 4, 14, 19, 25. Plaintiff emphatically insists that this version of events is supported by testimony of Sieda Walker and Stephanie Kent, both of whom were bystanders in separate areas near the parking lot at the time of the shooting. However, upon reviewing these witnesses' statements, it becomes clear that Plaintiff not only misrepresents their testimony, but in fact reinvents it. Crucially, both witnesses have separately confirmed that they did not, and could not, have made the observations Plaintiff now claims. In fact, Ms. Kent has repeatedly stated that she did not witness the standoff or the shooting at all, but rather only heard the gunshots. *See* Kent Dep. Tr. at 20:5–17 ("I didn't see it prior . . . because I was getting out of the car.").[6] Similarly, when Ms. Walker was asked to confirm that

---

Plaintiff does not genuinely contest Caccia's position vis-à-vis Servais's vehicle, but nevertheless seeks to convince a jury as much. This is not a genuine dispute of material fact.

[6] Similarly, in her statement to the police, Ms. Kent was asked, "[W]hen you said you heard gunshots did you actually see anybody discharge their weapon[?]" Pl.'s Ex. B at 5. She responded, "No." *Id.* Ms. Kent confirmed several times again later in her interview that she had not visually witnessed anything prior to the shooting. *See id.* at 5, 6.

she "couldn't see the movements or actions of [ ]  [Servais] inside th[e] vehicle" at the time he was shot, she responded, "That's absolutely correct." Pl.'s Ex. D at 5.[7]

By way of further example, Plaintiff—again purporting to dispute the reasonableness of the threat Caccia perceived—points to the plan Caccia made with his fellow officers prior to the confrontation in which, according to Plaintiff, they agreed they would not pursue Servais "if [ ] he had attempted to get away and leave the parking lot by his car or on foot." Pl.'s Br. at 10. Based on this factual premise, Plaintiff implies that Caccia and the other officers had somehow pre-determined that Servais was not dangerous and concludes that Caccia's subsequent perceptions of danger were not genuine or, at the very least, unreasonable. But Plaintiff misrepresents the record here in at least two respects. First, none of the detectives knew in advance who, if anyone, would accompany Dalton to return the rental car. *See* Defs.' SMF ¶ 30. Second, the officers' prospective decision to not pursue was entirely unrelated to Servais, or any other potential suspect for that matter. Rather, they reached this decision simply because they were in an unfamiliar area.[8] That plan, of course, changed dramatically once Servais escalated their eventual confrontation.[9]

---

[7] To be clear, Ms. Walker did report seeing Servais attempt to surrender, but only *after* he was shot. That is not, however, what Plaintiff represents in her opposition papers. *See, e.g.*, Pl.'s Br. at 19 ("The evidence in this case [ ] indicates that 2 eyewitnesses saw Plaintiff with his hands in the air at the time the Defendant shot him.").

[8] Plaintiff also argues that Caccia's actions were not objectively reasonable because Servais was "blocked into the parking space with nowhere to go." *See, e.g.*, Pl.'s Br. at 2, 4, 12, 23. But that contention not only ignores the obvious threat he posed during his standoff, but it is regardless swiftly disproven by the fact that Servais did in fact manage to escape from the parking lot.

[9] Make no mistake, the Court takes these misrepresentations and others like them quite seriously. Plaintiff has repeatedly acknowledged the important, sensitive, and fact-intensive nature of excessive force cases such as this one. Yet, Plaintiff has simultaneously flouted that very recognition and has forced this Court to engage in an unnecessarily extensive and cumbersome review of the evidentiary record. These tactics, beyond needlessly protracting the just disposition of Defendants' Motion, are clearly proscribed by law. Rule 11 of the Federal Rules of Civil Procedure emphasizes the duty of candor to the Court and constrains counsel to "stop and think" before making factual contentions. By signing and submitting papers to a federal court, counsel certifies not only that their "factual contentions have evidentiary support," but also that "denials of factual contentions are warranted on the evidence." Fed. R. Civ. P. 11(b)(3)–(4). Here, Plaintiff's counsel clearly did not head its caution. And while Rule 11

In short, Plaintiff has failed to point to a dispute of any material fact, much less a genuine one. The record clearly demonstrates that Servais was actively threatening Caccia and Bohn with his vehicle, all while disobeying their continued commands and actively attempting to flee. It has long been the law that if a suspect "threatens [an] officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11–12. The same holds true when a suspect threatens officers with a vehicle. *See, e.g.*, *Desabetino v. Biagini*, 844 F. App'x 481, 484 (3d Cir. 2021) (finding use of lethal force reasonable where suspect had "threaten[ed] to injure" an officer who was standing "in front of the vehicle").

Notwithstanding all of this, Plaintiff argues that Caccia's use of force was still unreasonable because, though Servais was driving directly at him, he did so "slowly," and had only moved forward by approximately one foot before being shot. *See, e.g.*, Pl.'s Br. at 4. As to how "slowly" Servais was operating the vehicle, Plaintiff does not say. Rather, she submits that Servais's rate of acceleration was slow enough such that Caccia could have, and should have, "moved out of the way," rather than use deadly force. *See id.* at 10–11. Ignoring for a moment that Plaintiff's argument is entirely at odds with her prior proffer that Servais had his "hands up" and was "trying to surrender," it nevertheless falls flat on its merits.

As an initial matter, the notion that Caccia should have moved out of Servais's way to avoid "being injured" or the "threat of injury" turns logic on its head, for it presumes the very threat that Plaintiff simultaneously insists did not exist. Pl.'s Br. at 10. After all, what sense does it make to "get out of the way" of a moving vehicle if not to avoid a legitimate threat? In any

---

affords the Court with broad discretion to redress such deception and gamesmanship, it finds that this admonition will suffice.

case, Plaintiff has not pointed to any authority even remotely suggesting that an officer, before deploying lethal force, must first attempt to evade an imminent threat posed by dangerous suspects set on avoiding capture. In fact, the Supreme Court and the Third Circuit have repeatedly held the opposite. *See, e.g.*, *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (concluding that officers did not act unreasonably in firing fifteen shots when the suspect "never abandoned his attempt to flee" and "even after all the shots had been fired, he managed to drive away and to continue driving until he crashed"); *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (holding that a police officer "is not constitutionally required to wait until he sets eyes upon [a] weapon before employing deadly force to protect himself against a fleeing suspect who . . . moves as though to draw a gun") ("Police officers do not enter into a suicide pact when they take an oath to uphold the Constitution.").

However, accepting that Servais was driving his vehicle "slowly" does not end the inquiry nor defeat summary judgment. Even when resolving the issue of Servais's acceleration in Plaintiff's favor, the Court must still determine whether it was objectively reasonable for Caccia to believe, "in light of the totality of the circumstances, that deadly force was necessary to prevent [ ] [Servais's] escape, and that [ ] [Servais] posed a significant threat of death or serious physical injury" to either him or others. *Thompson v. Howard*, 679 Fed. App'x. 177, 181 (3d Cir. 2017) (quoting *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999)) (internal quotation marks omitted). The Court makes this assessment in reliance on the *Graham* factors and from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. at 396–97.

14

The record in this case quite plainly demonstrates that Caccia was confronted with a tense, dangerous, and rapidly evolving situation in a populated area. Servais was a suspected accomplice in two serious and exceptionally violent armed robberies that occurred just days prior. What is more, Caccia knew that Servais had a remarkably troubling criminal history, and that he was in fact wanted in connection with a separate, vehicular homicide charge that supposedly occurred during a prior flight from law enforcement. Before Caccia had fired his weapon, Servais was actively attempting to flee, refused to comply with orders to surrender, and had, just seconds prior, attempted to strike Bohn with his vehicle. Yet, Caccia did not deploy deadly force until after Servais had proceeded to drive directly at him and did not stop until after he was shot.[10] It was only after Servais escaped from the parking lot and began to succumb to his injuries did he attempt to surrender.

Plaintiff readily ignores all of this, dwells on the rate of Servais's acceleration, and omits one particularly critical detail—the front of Servais's vehicle and Caccia's body were separated by mere feet. Under these circumstances, to suggest that Servais needed to step on the gas pedal just a little harder before Caccia's fears could become reasonable would have sooner realized the very disaster that Caccia's split-second decision was calculated to avoid. Thus, even if Servais was driving his vehicle at Caccia "slowly," as Plaintiff insists, any reasonable officer in Caccia's position would have still feared for his life based on this short distance alone. *See Martin for Est. of Webb v. City of Newark*, 762 F. App'x 78, 83 (3d Cir. 2018) (finding use of lethal force reasonable given officer's proximity to non-compliant suspect attempting to start his car) ("Even

---

[10] Plaintiff's Opposition fixates on the fact that Bohn did not discharge his weapon when Servais first drove at him. According to Plaintiff, the "very fact that Detective Bohn got out of the way, when Caccia did not, means that he lacked an objectively reasonable basis to fear for his own safety." Pl.'s Br. at 10. To be clear, Bohn has never testified that he did not use deadly force because the danger Servais presented did not warrant it. Nor has he ever expressed a belief that Servais did not present an imminent threat to his safety or that of others. To the contrary, Bohn maintains that he "didn't pull the trigger" because he "was more worried about getting out of the way" when Servais tried to strike him. Bohn Dep. Tr. at 54:10–16.

assuming that the car had not yet moved at the time of the shooting, a reasonable officer . . . would have feared for his life given [suspect's] bold actions."). Any reasonable officer would have likewise believed that Servais's erratic and defiant actions posed a danger to his fellow officers, particularly given Servais's criminal history, his propensity for flight, and the fact that he had, just seconds prior, attempted to strike Bohn.[11] *See Desabetino*, 844 F. App'x at 484 (finding use of lethal force reasonable where suspect "presented a danger by operating his vehicle in close proximity to the officers"); *Brosseau v. Haugen*, 543 U.S. 194 (2004) (holding that officer was entitled to qualified immunity after she shot "a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area [were] at risk from that flight").

In conclusion, the Court finds that Caccia's resort to lethal force was constitutionally reasonable under the circumstances. Because Caccia did not violate Servais's Fourth Amendment rights, Defendants' Motion for Summary Judgment is accordingly granted.[12]

### 2) *"Clearly Established" Inquiry*

Even if the Court were to find that Caccia violated Servais's rights under the Fourth Amendment, Caccia would nevertheless be entitled to qualified immunity under the second prong of the analysis. Again, qualified immunity seeks to shield public officials from civil liability, provided that they did not "violate clearly established statutory or constitutional rights

---

[11] Plaintiff also advances an additional argument to demonstrate that Caccia acted unreasonably. Specifically, she submits that Caccia violated the Attorney General of New Jersey Guidelines by not "moving out of the way of the path of a moving vehicle." Pl.'s Br. at 2. However, even assuming that these guidelines factor into this analysis, they required nothing of the sort. In fact, "the inquiry pursuant to the guidelines is the same as the objective reasonableness assessment above, prohibiting the use of deadly force absent a reasonable belief that it is necessary to protect against imminent danger of death or serious injury." *Webb*, 762 F. App'x at 84; *see also* Pl.'s Ex. F at 29.

[12] Because the Court concludes that Caccia did not violate Servais's Fourth Amendment rights, any related federal claims asserted against CMCPO or the State of New Jersey consequently fail as a matter of law. *See Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir.2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim.").

of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Clearly established" means that, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *James v. New Jersey State Police*, 957 F.3d 165, 169 (3d Cir. 2020). For purposes of qualified immunity, the Court must look to binding, factually analogous precedent from either the Supreme Court or the Third Circuit. *See Peroza-Benitez*, 994 F.3d at 165. Alternatively, the Court may find a clearly established right through a "robust consensus of cases of persuasive authority in the Courts of Appeals." *James*, 957 F.3d at 170 (3d Cir. 2020) (internal quotation marks omitted).

Here, the Court holds that Caccia is entitled to qualified immunity because it was not clearly established, in October 2018, that an officer uses excessive force when he shoots a suspect who, during a standoff, ignores officers' commands, repeatedly threatens officers with his vehicle, and actively attempts to evade arrest in a populated area. This Court finds quite the opposite. Relevant case law more readily supports the conclusion that a reasonable officer would not have believed that Caccia's actions here violated Servais's Fourth Amendment rights. *See, e.g.*, *Brosseau*, 543 U.S. at 200–01 (holding that officers who shoot at suspects "set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight," do not violate clearly established law); *Plumhoff*, 572 U.S. at 777 (holding that officers did not violate the Fourth Amendment and alternatively were entitled to qualified immunity when they fatally shot a fugitive whom the officers reasonably believed was "intent on resuming" a chase that "pose[d] a deadly threat for others on the road"); *Bland v. City of Newark*, 900 F.3d 77, 83–84 (3d Cir. 2018) (holding that officers were entitled to qualified immunity for firing at a fleeing suspect when his "behavior threatened the safety of the officers, as well as the public at large").

Likewise, Plaintiff has not pointed to any binding authority or "robust consensus of cases of persuasive authority" that placed the answer to this question beyond debate. Rather, Plaintiff simply argues that the unconstitutionality of Caccia's actions was clearly established in *Tennessee v. Garner*. However, Plaintiff's reliance on *Garner* is misplaced because it did not concern the relevant right at issue. *Garner* merely announced the general principle that a "police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. The Supreme Court has repeatedly explained that "*Garner* . . . do[es] not by [itself] create clearly established law outside 'an obvious case.'" *White v. Pauly*, 580 U.S. 73, 80 (2017). Consistent with this directive, federal courts have only found such "obvious cases" in the "absence of a serious threat of immediate harm to others." *Davenport v. Borough of Homestead*, 870 F.3d 273, 281 (3d Cir. 2017). As previously explained, the record here demonstrates that a reasonable officer would have perceived that Servais posed such a threat. *Cf. Kane v. Barger*, 902 F.3d 185, 195 (3d Cir. 2018) (finding a violation was "obvious" because "it seem[ed] absurd to analyze whether the right . . . was clearly established by case law at the time of [the defendant's] conduct").[13]

In further support of her argument against qualified immunity, Plaintiff points to the Third Circuit's decision in *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999). The problem, however, is that *Raso* "did not render a holding concerning qualified immunity or, for that matter, objective reasonableness—instead, [it] reversed a grant of summary judgment in favor of an officer who shot at a moving vehicle containing a fleeing shoplifter after finding a dispute of

---

[13] The Court emphasizes that this case presents none of the factual underpinnings present in *Garner*. There, a police officer pursued an unarmed, non-dangerous teenager suspected of a non-violent property crime. *See* 471 U.S. at 3. Believing that the teenager would elude capture by climbing over a chain-link fence, the officer fired his revolver and shot the teenager in the back of the head, killing him. *See id.* The factual distinctions separating *Garner* and this case are obvious.

18

fact regarding whether the officer was in any danger at all at the time of the shooting." *Martin*, 762 F. App'x at 84.[14] Beyond *Raso*, Plaintiff cites to various precedential and non-precedential Third Circuit cases which, apart from being factually and legally inapplicable on their face, must be disregarded because they were issued after October 18, 2018. *See Pearson*, 555 U.S. at 232 (stating that qualified immunity applies unless "the right at issue was 'clearly established' *at the time of defendant's alleged misconduct*" (emphasis added)).

Simply stated, the Court has found no Supreme Court precedent, binding Third Circuit precedent, or robust consensus of persuasive authority holding that "an officer acting under similar circumstances as [Caccia] . . . violated the Fourth Amendment." *White*, 580 U.S. at 79. Thus, even if the Court were to find that Caccia's actions constituted an unreasonable use of lethal force, he would still be entitled to qualified immunity under § 1983. For all of these reasons, and for those articulated above, Defendants' Motion for Summary Judgment is granted.

### B.  Plaintiff's Civil Conspiracy Claim

Next, the Court considers Plaintiff's conspiracy claim against Caccia. In support of this claim, Plaintiff maintains that Caccia engaged in a conspiracy with non-party Bohn to cover up his unconstitutional use of force. Following their confrontation with Servais on October 18, 2018, Caccia and Bohn both reported that Servais hit the front of Caccia's vehicle during his first attempt to strike Bohn. *See, e.g.*, Defs.' Exs. F at 8, H at 26. A subsequent laboratory report issued by the New Jersey State Police's Office of Forensic Science was unable to conclude that, based on the color of three reference paint samples, a paint transfer had occurred between the two vehicles. *See* Pl.'s Ex. H. Based on this report, Plaintiff concludes that Servais had not struck

---

[14] Plaintiff has also cited to several cases from the Ninth and Fifth Circuits which, apart from being factually and legally incompatible with this case, fall short of evincing the "robust consensus" of persuasive authority necessary to find a clearly established right.

the front of Caccia's vehicle, and that Caccia and Bohn had in fact falsified their accounts in an "attempt to justify" Caccia's use of deadly force. *See* Pl.'s Br. at 26. Notably, Plaintiff does not otherwise dispute that Servais drove his vehicle at Bohn and Caccia. Rather, she only submits that Servais did not hit Caccia's vehicle in the process.

"To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293–94 (3d Cir. 2018). Once a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, she must "provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184–85 (3d Cir. 2009). Here, the Court finds that Plaintiff's conspiracy claim against Caccia fails at the very outset because she has not, and cannot, establish that any constitutional violation has occurred. "Section 1983 does not create a cause of action for conspiracy to deprive a person of their constitutional rights without an actual deprivation of rights protected by the statute." *Gravely v. Speranza*, 408 F. Supp. 2d 185, 191 (D.N.J. 2006), *aff'd*, 219 F. App'x 213 (3d Cir. 2007).

Because the Court has already concluded that no Fourth Amendment violation has occurred, any claim that Caccia attempted to cover up an unconstitutional use of lethal force necessarily fails as a matter of law. *See Fields v. City of Pittsburgh*, 714 F. App'x 137, 143 n.5 (3d Cir. 2017) (affirming summary judgment on conspiracy claim where district court had previously affirmed the predicate excessive force claim). As such, Defendants' Motion for Summary Judgment is granted.

## C. **Plaintiff's State Law Claims**

Lastly, the Court addresses Plaintiff's various state law claims against all Defendants for, among other things, assault, battery, and wrongful death—all of which arise out of Caccia's use of lethal force. Similar to § 1983, the New Jersey Tort Claims Act (the "NJTCA") also provides public employees with immunity from suit where they act "in good faith in the execution or enforcement of any law." N.J. STAT. ANN. § 59:3-3. However, this immunity does not extend to public employees if their conduct "constituted a crime, actual fraud, actual malice, or willful misconduct." *Id.* § 59:3–14(a). Importantly, "the same 'objective reasonableness' standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under [the NJTCA]." *Norman v. Haddon Twp.*, No. 1:14-CV-06034, 2017 WL 2812876, at *13 (D.N.J. June 29, 2017).

Here, because Caccia's use of lethal force was objectively reasonable and did not violate a clearly established right under the Fourth Amendment, the Court holds that he is immune from suit, and that Plaintiffs' remaining state law claims against all Defendants consequently fail as a matter of law. *See N.E. for J.V. v. State Dept. of Children and Families, Div. of Youth and Family Services*, 158 A.3d 44, at 59 (2017) (applying the NJTCA) ("Objective reasonableness will be established if the actor's conduct did not violate a clearly established constitutional or statutory right."); *Conde v. City of Atl. City*, 293 F. Supp. 3d 493, 508 (D.N.J. 2017) (granting summary judgment as to plaintiff's wrongful death and survivorship claims because there was "no underlying constitutional violation"). To this end, Defendants' Motion for Summary Judgment is granted.

## V.    CONCLUSION

For all of the reasons set forth above, Defendants' Motion for Summary Judgment is granted in its entirety.


Dated: July 31, 2023

*/s/ Karen M. Williams*
KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE
